is Drummond v. Southern Company Services, Inc. will give a moment for counsel to get settled at the tables. Alrighty, we'll begin with counsel for Mr. Drummond and Mr. Odom. Good morning, Your Honor, and may it please the Court, Rachana Pathak for the appellants. ERISA requires plans, sponsors, and fiduciaries to offer each married participant a joint annuity that is the actuarial equivalent of a single annuity for the life of the participant. Defendant's position is that they can calculate joint annuities using any set of actuarial assumptions they want, as long as they are written down in the plan document. That's not consistent with the plain language of 29 U.S.C. 1055, the historical backdrop, or the statutory context. What 1055d requires, and what it has always required, is that a plan, sponsor, and fiduciary accurately calculate the value of a participant's single life annuity and then match that value when they're offering a joint annuity. The defendants, by using outdated actuarial assumptions, are not doing that. And so, let me ask you a question about that. Are you saying, I guess I'm wondering about the time frame for when you are suggesting that the two numbers must match? The time frame is, Your Honor, that the value of the joint annuity has to match the value of the single annuity, the single life annuity, that the participant could get, which would commence upon their retirement. Okay, so we check it at the time of retirement. Yes, that's right. Well, at the time the benefits commence, to be most precise. But there's a little bit of giving the joints here, because the way that an actuary is going to measure the value of a single life annuity is by looking at what the realistic lifespan is, or what's the likely stream of payments, and what's an appropriate discount rate at the time that the payments are actually going to happen. And so, that's not going to be one particular date in time or one exact number. Two actuaries might give slightly different values to the present value of a single life annuity, but they're not going to use assumptions, mortality assumptions, from 50 years ago. An actuary who is trying to figure out the real world value of a single life annuity will not look at mortality data from 50 years ago, because that data will give an inaccurately low valuation for the single life annuity. An actuary is going to ask, how long are these payments actually going to last? And that depends on current mortality assumptions. Let me ask you. So, they make this point in their brief, which I just want you to respond to. They say something to the effect of, as long as you're using the same discount rate and the same mortality table to get the present value on the single life annuity and the joint life annuity, then there really isn't any problem. You know, they say, look, this was like, we could see a problem if we were using sort of one mortality table to get the present value on single life and then a different one for joint life. But as long as you're using the same mortality table and same discount rate, then it doesn't really matter. What do you say about that? Yeah, so there's a few problems with that. First of all, there's a textual problem with that. There's a historical problem with that. And then there's also a statutory context problem with that. Let me start with the text, because I think that's the most important problem. The step 1055D requires the joint annuity to be equal to a single annuity for the life of the participant, the real world participant, somebody who's actually retiring and going to get a single life annuity. By using a mortality assumption from the 50s to give a value to that single life annuity, they're not matching the joint annuity to the accurate single life annuity. In other words, Congress is establishing a benchmark. It is saying that the joint annuity has to be equal to something, a real thing, a single life annuity that commences today or in 2018. When they use an old mortality assumption to value the single life annuity in the first place, they're matching the wrong thing. They're matching something that is older than the single annuity for the life of the participant. So there's a text problem there. Congress didn't use the word a life of a participant. It used the words the life of the participant, right, the real world participant. That's the first problem. The second problem is that what's Congress trying to do here? The purpose for the statutory context is that Congress is requiring married participants to receive a joint annuity for their protection. It makes no sense to say that Congress would have authorized a joint annuity to be smaller in value than a single life annuity. Well, I guess, and this is where I guess, and maybe this is just a math issue, but it seems like what they're suggesting is as long as you're using the same mortality tables and the same discount rate for both calculations, you're not going to end up in a situation where the joint life annuity is less than the single life annuity. It's going to be like in a wash, right? Like if you use a 1950 mortality table to figure out, well, how much a single life is worth and you use a 1950 mortality table to figure out how much a joint life is worth, like, what's the problem? Like they're going to both be equally wrong. They might be, yeah, they might be wrong, but they might be equally wrong. But the, so the problem with that, Your Honor, is that Congress doesn't allow them to be equally wrong. The Congress. That's your first point, I guess. Congress defines the single life annuity that the joint annuity has to be equal to. The joint, the single annuity that the joint annuity has to equal is a single annuity commencing today because that has a value. There is an accurate value to the single life annuity. It has a, that has a meaning. And it's not. Okay, that's your, that's your first point. You are, you say you had three points. That was your first one. You already went through that. Well, that's, I mean, that's our core position, Your Honor. And we think it's support in. And so my pushback, I guess my pushback on your second point was like, what if they're just equally wrong? And it sounds like you have no response to that. Except, you know, I think that the response to that, Your Honor, is that it doesn't fit the statutory context in at least a couple of different ways. So what. Well, your second point was that it wouldn't be fair to have the joint life annuity be less than a single life annuity. And my question to you was, okay, what if they're just equally wrong? So there's not like this disparity. They're just both calculations are not accurate, but they're not like, it's not like one is less than another. They're just both based on old data. So that is your second point. Does your second point still hold? Yeah, I want to unpack one thing, Your Honor. Because I think it's possible that there's one misunderstanding here. A single life annuity, the monthly payment is not, the monthly payment amount does not depend upon actuarial assumptions. The monthly payment amount of a single life annuity depends upon the terms of the plan, usually years of service. So the value of that single life annuity is determined by how long that single life annuity is likely to be paid. Well, you say likely to be paid, but that's the actuarial assumption. That is the actuarial assumption. The actual value of it is how much, how long the person actually lives. That's true. And so we don't know the actual value, and this is possible to know that. So that's why we use the assumption. Well, the accurate, an actuary would say that the accurate value of a single life annuity is how long it's likely to be paid, right? They have to make an estimate. And so when you say that the two, that the SLA and the JSA are equally wrong, that's actually, it's actually not quite right. Because the SLA, if the participant were unmarried, right? If you have two identical participants, one's married, one's unmarried. That unmarried participant, their SLA, what is it actually worth? It is actually worth, whatever the monthly payment amount is, stretched over a period of time determined by how long that participant is going to live. And so if you took that same person and you gave them a JSA, their JSA is not going to be worth the same as the real thing that they'll be getting. They're not equally wrong. They're only equally wrong in the conversion. So that's the whole point is that when they do the conversion, they underestimate one, which means they're not hitting the target that Congress tells them to hit. And the reason that that's a problem is because Congress is trying to give married participants something that is as valuable as what an unmarried participant would get, but just stretched over a long period of time, a longer period of time. I have a question that I think is along the same lines, but maybe, maybe will help us drill down. So I want to make sure that I understand what you're saying, where in the process the plan allegedly went wrong. Is it, one, did the plan use unreasonable methods to calculate the present value of a single life annuity, as I think your 28-J letter suggests, thereby deflating the value of a converted joint and survivor annuity? Or two, did the plan accurately calculate the present value of a single life annuity, but then used unreasonable conversion methods leading to an undervalued joint and survivor annuity? It's the former, Your Honor. There's a technical wrinkle, which I hate to introduce. There's a technical wrinkle, which is that in these conversions, which are using the older mortality assumptions creates sort of a problem at two steps. But what you said, the first thing you said is exactly right. The first place that they falter is that they undervalue the single life annuity. They use that old mortality assumptions to value the single life annuity. And then they, and by doing that, they create for themselves the wrong target. They also create for themselves, their position is that the single life annuity can be worth anything, right? They say that they can use any set of assumptions they want, as long as they're written down in the plan. So they can match any value. What that would mean is that a joint annuity could be worth half of the real world value of a single life annuity. That can't be what this statute means. It's funny. I do think, I mean, I've talked about this case a lot with my law clerks. We've really tried to figure this case out. It does seem like the question here is somewhat of whether you believe that the single life annuity has an objective value, or whether you think it has a value that's just based on what estimate you use for mortality. And your position is that it has an objective value, right? That it has an objective value, and the point is to try to figure out that objective value. Well, I think that that's right, Your Honor. Although I do want to clarify one thing, which is that actuaries wouldn't tell you that the single life annuity has just one number. There might be two actuaries who pick two slightly different numbers. I think that's right, and I guess that's my concern, is that it doesn't really seem like it does have an objective value. It seems like it has a value that really, we can't say, you know, when John Smith retires, this is the value of a single life annuity, because really it depends on how long he's going to live, and we don't know that. We can say that, like, in this population of people, of retirees at, you know, in this pension plan, like, we can sort of guesstimate that the average amongst that retirees, their single life annuity will be worth X, Y, Z, and that's really what we're doing, right? Well, that's the term actuarial equivalent. So, when we ask about what the value of an annuity is, we're asking how would an actuary value that annuity, and they're not going to, they're going to do it by estimating, and they're going to look at the population, and they're going to ask what a realistic lifespan is going to be for the stream of payments, and they're not going to look at mortality data from 50 years ago. Defendants' interpretation, to be clear, Your Honor, says that they can use any estimate they want. If you believe that there's, if you don't, you have to adopt, you have to believe there's no standard in 1055D in order to adopt their interpretation of the statute. There's obviously a standard, right? It may not have just one number for meaning, but it has a prescribed, there's a prescribed range of assumptions that are appropriate to use to value the single life annuity. And you're also saying there's a second problem, right? I mean, the second problem, for example, would be if you're using mortality tables that are much older, and let's say women's mortality is 77, and the man's mortality is 70. But at current times, the mortality for women is actually 85, and men is 77, or something like that. Then you're calculating the JS, you're calculating the SLA on 70 instead of 77, and then the woman is living to 85, so she's getting the benefit of only up to 70 years age instead of up to 77 if the man is the one who is the person who is working for the company. Is that what you're saying also? So yeah, you've identified that the calculation is problematic in two, and when an actuary describes this, they explain that the calculation is problematic in two ways. There's that initial first problem of devaluing the SLA, and you're pointing out that they also, as a result of an old mortality assumption, impose too high of a charge, for lack of a better word. They're charging too much for offering the JSA because of what you just identified. So because they don't hit the appropriate target, Your Honor, we think that's why they violate 1055D. On the second issue, on the QPSA, could you just address it? I think the defendant's position is that if you lose on the first issue, you necessarily lose on that issue. What do you say about that? I disagree, Your Honor. So 1055I has different language. It doesn't have exactly the same language as 1055D. It talks about having to take into account the cost of providing the QPSA and to do so in an equitable manner. They're not even taking into account the cost because they're inflating the cost by assuming that people live for a shorter period of time than they actually do. And so I think that the fact that we've got different statutory language means that counts one and three are, in fact, independent. If you have questions about count two, I'm happy to address them. Otherwise, I'd like to use the remainder of my time for rebuttal. All right. Thank you, counsel. Thank you. And you've reserved three minutes. We'll hear next from Ms. Hines. Good morning, and may it please the court. Ashley Hines on behalf of the appellees. You have heard the appellant say today that they would like a calculation done for each participant at the time benefits commenced, but also perhaps that that time could vary and that the calculation could actually vary. You've also heard appellants say multiple times that actuaries are not going to use older mortality assumptions. Well, it is not a maxim that newer mortality assumptions mean better benefits. In fact, this case and the allegations by the two appellants, the two participants here, actually prove the opposite. But let me ask you a question, because it seems like, and maybe I'm misunderstanding your position, and if I am, I want you to let me know. It does seem like your position is they could use any numbers they wanted, as long as they use the same table of numbers. Am I misunderstanding your position? No, Your Honor, you're not. So could they use, I'm sure that there were not actuarial tables in 1789, but let's just assume for our purposes that there were. And as you know, medicine was very different then. People's lifespans were probably less than half of what they are now. That would be okay under what you're suggesting. Your Honor, Congress in 1055d has allowed plans to determine what assumptions should be used for the actuality. I'm sorry to interrupt, but can you just answer my question, please? Would that be okay? Yes, Your Honor, plans could do that, but practically plans are not going to do that. Of course, sitting here in 2025. Well, what's to stop them? It's not a good idea if they can, right? That'd be a lot fewer benefits, I would assume. Well, there are practical constraints, and there's also constraints in ERISA. The constraint in ERISA is, of course, the anti-cutback provision in 1054, which does not allow plans to make amendments to assumptions that would change, that would decrease the value of the accrued benefits. The issue here, of course— But that's for existing plans, I guess, right? Yes, for existing plans. What about new plans? New plans could, Your Honor, pursuant to 1055d, use the assumptions that the plan sponsor determines to put in the plan. Practically, however, Your Honors, that is, of course, not going to happen in 2025. Why isn't that going to happen? Well, of course, the assumptions pursuant to 26 U.S.C. 401A-25 must be stated in the plan documents. There's a provision of ERISA that also requires them to be stated in the plan documents to preclude discretion in the application, which does get to the point that Judge Brasher was making about the same assumptions being used on each side. How does that prevent the company from— I mean, so they have to say what they're doing. How does it prevent the company from using 1789 actuarial tables just because it has to say what it's doing? That it's in the plan makes it available to participants. A key tenant of ERISA is, of course, notice to the participants. Participants could see those— I'm sorry to keep interrupting, but I'm just not getting it. Like, it seems to me that what you're saying is that plans might be embarrassed to do that so they wouldn't do it. But you're not telling me that there's any kind of legal, structural reason that would prevent them from doing that. Am I understanding you correctly? That's correct, Your Honor. That's because that's how Congress set up the system in 1055D. It seems like your briefs are relying a lot on the D.C. Circuit case Stevens and the word—the use of the word given in that case. And it seems to me that given could mean what you say it means, or it could either—it means either specified, fixed, or something assumed or taken for granted. So I don't read that case as establishing a kind of carte blanche for plans to choose whichever actuarial tables they want. It didn't seem like that case was really getting into that. So why do you put so much weight on that particular line from an out-of-circuit case years ago? Stevens, Your Honor, is a helpful statement of what actuarial equivalent meant at the time that Congress put it into ERISA in 1974. And both parties' submissions to this court on Monday in our letter briefs answering questions from this court substantiate that the definition in Stevens that two modes of payment are actuarially equivalent when under—excuse me—when their present values are equal under a given set of actuarial assumptions, that was also the understood meaning prior to 1974. I think it's really important to look, too, at the appended historical materials to those briefs filed on Monday. Impertinent part, appellant's cite to actuarial aspects of pension security from 1965. That's at docket 71 at docket pages 22 and 24. That says, and they quote, it is general practice to determine the reduced pensions on the basis of actuarial equivalents calculated on appropriate mortality tables. They significantly leave out the next parenthetical phrase, which may be either those adopted for the plan or other appropriate tables. Just as Stevens said, the assumptions are given, just as for 51 years plans have given those assumptions. So let me ask you a question then about Stevens, because Stevens, one of the things Stevens relies on is Schwarzman and Garfield, actuarially equivalent benefits, right? Isn't that? Yes, sure.  So, um, Stevens or Schwarzman and Garfield actually says, periodically, the interest and mortality assumptions used must be reviewed and modified so as to ensure that they continue to fairly assess the cost of the optional basis of payment. Doesn't that suggest that the assumptions have to be reasonable assumptions? No, Your Honor, and that's not baked into the text of 1055. Congress did not add a requirement to ERISA for updates of the actuarial factors that are used for the calculation demanded by 1055-D. And this makes sense because Congress was balancing both the participants' rights to receive benefits promised under the plan, right, because if you recall, you probably don't recall, but you may know that in 1974, right, ERISA was passed amidst a decade of study because pension plans were failing. Pension plans were going bankrupt. So two things were very important. One, that participants would get benefits that were promised to them in the plan contracts. And two, that employers would have a predictable set of benefits so that they could make sure they could cover the liabilities. 1055-D allows just that, right? It allows the plans to put in the actuarial calculations that they're going to use the factors. Mortality and interest rates are part of the factors, right, that go into the 1055-D calculation and then allows it to make a plan to be able to fund those liabilities. Plaintiff's approach or appellant's approach would require much more constant updates, to your point, Your Honor, but that is not mandated by ERISA, nor are the words reasonable or current as they ask for here. So would you agree that actuarial equivalent is a term of art? I mean, we've been citing treatises. We've been talking about all these kinds of things that seem to me at least to suggest it's a term of art. Would you agree with that? Yes, Your Honor. It's an actuarial term. Why shouldn't we just, why shouldn't we then accept the term of art, what it means as a term of art, in the profession as the meaning within the statute? That's exactly what Stephen says, Your Honor, and that's what we are asking this court to accept. All right. And so ASOP 27 says that the assumptions have to be reasonable, right? ASOP 27, respectfully, Your Honor, does not apply to individual benefit calculations, and appellants actually concede as much in their letter brief on Monday. ASOP 27 applies to aggregate liability level calculations for the plan. And, of course, while it applies and provides guidance to actuaries in trying to figure out what the plan's aggregate liabilities may be, it, of course, cannot overcome ERISA. There's clear case law on that point that the ASOPs are guidance for the field but not demanding any requirements that may contradict ERISA. Again, though, here, ASOP 27 doesn't apply to the calculations we're talking about in 1055D. And I think it's important to know... But, I'm sorry. I just want to ask you a question about something you said. So the aggregate numbers that you're talking about that ASOP 27 addresses, isn't that the prediction of the cost to pay out the JSAs? Yes, Your Honor. Well, in part, Your Honor. But wouldn't it be silly to have much higher projections for what the cost is to pay out the JSAs, or even different projections for that, than you're using for the underlying individual calculations? That, respectfully, Your Honor, there's not a difference. And I think this goes to a question that was the end of the Court's order regarding whether or not the present value of the JSA, the joint and survivor annuity, would be different under the provisions for aggregate calculations for plan liability, plan funding purposes, than would be under 1055D. The answer is it's not inconsistent. It's our understanding, my understanding, that in the actuarial world, both are given credence, both the plan's assumptions for a qualified joint and survivor annuity, as well as the prescribed statutory actuarial assumptions to determine those aggregate liability funding level questions. I'm sorry, what is the point of having, I mean, how does that inform the plan? How does that inform the employer how much it's going to cost? If you are using different sets of assumptions for the individuals in the plan, then you are for the aggregate number. I think explaining it, Your Honor, may help a little bit to understand how this works. So it's not a different number, if you will. So on the one hand, let's take it step by step. So the first step for actuaries to determine the present value of accrued benefits for the statutory provisions, for example, for minimum funding under Section 1083 that was referenced in the order. First, actuaries determine the joint and survivor annuity amounts using the plan's actuarial equivalent assumptions. The assumptions that the plan put in pursuant to 1055-D, they, of course, have to make an estimate based upon plan experiences to how many participants that are not active participants are going to take the joint and survivor annuity as opposed to a single life annuity. Actuaries make that assessment and then apply those JSA factors from the plan. So let's say you have $1,000 monthly as a single life annuity. Perhaps then you apply the percentage in the plan and you have a $950 monthly payment on a joint and survivor annuity. Second, the actuaries then use the prescribed statutory assumptions, those that 1083 mandates be used for the calculation to determine how long the plan is going to have to, based on those assumptions, which include, obviously, mortality and expectations. How long does it have to pay those out? Just to make sure I'm on the same page. Does 1083 require reasonable assumptions? The statute you just invoked. 1083 has two requirements, Your Honor. One uses the word reasonable assumptions, but then directly applicable to 1083 are prescribed assumptions, which take you to Section 430H, which are the same assumptions used under 26 U.S.C. 417E for lump sum distributions. And it's that provision that's really important here. That is a corollary provision to 29 U.S.C. 1055, for lump sum distributions. And the statutory history of 1055G is very telling here as to the distinction and meaning of 1055G versus 1055D. I say that because 1055D and the definition of a qualified joint and survivor annuity has never been changed since 1971 by Congress. Quite the contrary. In 1971, ERISA envisioned under 1054 that their lump sums would be actuarially equivalent to annuities. In 1984, Congress stepped in to say they didn't think plans were doing it the way they wanted to. They thought there was a problem, particularly with interest rates being applied to the lump sum calculations. Beginning in 1984 and over 30 years, Congress then amended how calculations should be done by plans for lump sum distributions. That now, in 1984, they started with interest rates in 1994. They included mortality assumptions. Those amendments continued through 2014. And those prescribed mortality and interest rates are used today for lump sum distributions only. Congress did not touch 1055D. It did not mandate the particular assumptions, either in 1974 or at any time until today, that must be used to calculate a qualified joint and survivor annuity. And to Judge Brasher's point, our question earlier, that the point remains that from our briefs and from history of looking through the sources that appellants have cited too, the plan gives those terms. And so long as you are using the same assumptions on both sides of that actuarial equivalence equation, then it is giving you an actuarial equivalent qualified joint and survivor annuity to the single life annuity. And is that, is, I want to make sure I'm understanding your argument. Is that same actuarial table used for the plan to determine its expected outlay for the single survivor,  Yes. So if I'm understanding your question correctly, Judge Grant, so on one side of the actuarial equivalent equation mandated by 1055D, excuse me, you have the single life annuity multiplied by a factor. That factor is determined based on the mortality and interest rate assumptions set in the plan. Those same factors are used to determine the present value of the single life annuity applied to the single life annuity to give you the QJSA. So I guess what I'm saying is a little bit different, which is, as you explained, ERISA was created in part to help companies know what they needed to plan for, right? Yes. So if I'm a company and I have one retiree and I go to an actuary and say, how much money do I need to save so that I can make sure that I can pay out this man's benefits? And the actuary applies the 1789 mortality tables to tell me how much I'm likely to owe. That's not going to be likely correct, right? Is there some other part of the statute that tells the companies what they need to, what actuarial views they need to use to estimate their benefits on that side of things? No, Your Honor, there's nothing in ERISA to say what assumptions should be used to determine the qualified joint and survivor annuity. It just must be the actuarial equivalent of the single life annuity. I'm not asking about the joint and survivor annuity. I'm asking about the single life annuity. Is there, I would be surprised if there's not some sort of either specific or understood requirement to use an accurate or reasonable actuarial assumption to figure out what the company is going to owe in the first place for those single annuities. I apologize. I think I misunderstood your question from the start. So the single life annuity is determined, of course, based upon a formula in the plan based upon years of service, right? And earned benefits in order to determine aggregate plan liabilities under sections like 1083 that we talked about earlier. There are prescribed assumptions to be used that would be applied by the actuaries to the SLA as part of that overall analysis of what a plan has to have cash on hand funds to pay those liabilities. You can use those actuarial tables over here to figure out what you're actually probably going to owe. But in order to figure out that these two types of plans are equivalent, you can use entirely different actuarial assumptions. Here, yes. As far as the single life annuity goes, Your Honor, yes. And that's how Congress set it up because in order to try to figure out a qualified joint and survivor annuity monthly payment amount, the plan first has to take the present value of the single life annuity using the same assumptions it's then going to use for the qualified joint and survivor annuity. It's a way to estimate how long that single life annuity would be paid out so that you can then figure out what amount should be paid to the participant and then the surviving spouse after that participant's death. And Congress left it to the plans to do that. And for that reason, it's Congress's job if there's some issue here that has been identified by these cases that have been filed, it's Congress's job to change the statute. But again, 1055D has not been changed since 1974. Just a question to clarify the process of this. So how does the actual equivalence work in the sense that are we asking the question does the class of single life annuity sort of people who receive that equal the class of people that receive the joint life? Are we asking does Joe Smith's when he sits down to retire and he finds out that if I retire, I'm going to get like you say a thousand dollars a month under single life. But then he has the option to say this is what I'm going to get in our joint life. Is that the question that we're trying to find out whether there's actual equivalence for Joe Smith? That is the question that's presented to this court today. I believe the calculation is done both ways and various times under the ERISA scheme. But yes, Your Honor, the claims brought here today are whether or not the calculation has followed the plan, excuse me, but the calculation done by the plan has followed ERISA. We submit that it follows what 1055D requires. And it's on an individual basis, right? I get that's the point. Yeah. So it might well be that when the plan is trying to figure out like, look, do we need $1 million in funds or do we need $1 billion in funds? They're going to look at their entire class of retirees and apply some assumptions there and whatnot. That might be different from the assumptions that they apply when Joe Smith is sitting down and saying, well, I can get $1,000 a month or I can get what a month, right? That seems to be what you're saying. Correct, Your Honor. It's done based upon the plan experience. And I think that's why it's very telling here, right? The plan terms that have been challenged, that were challenged from the outset, were that Mr. Drummond's benefit was calculated based upon the 1951 group annuity mortality table. He says he is actually better off, and the math shows he's better off under that mortality table than the mortality tables under 417E, which are newer mortality tables that are used for lump sum calculations. And Mr. Odom likewise alleges he is better off under the 1951 mortality assumption based, mortality based assumptions than he is under newer assumptions. So it is not a maximum rate that newer is better. It is not that what plaintiffs are advocating for here is going to give higher payments. It actually may lower payments for many participants. And we actually don't know how long Mr. Drummond is going to live or how long Mr. Odom is going to live. So we don't know, like as an objective matter, what their single life annuity would be worth. Correct, Your Honor. And that's precisely why appellants attempt here today to extricate the phrase for the life of the participant away from the full phrase of single life annuity, which they admit in their briefs, single annuity for the life of the participant is a phrase that means a single life annuity in the traditional sense. That phrase does not get broken into parts. And again, Section 1055D does not require what appellants are asking for and asking this court to import into it today. All right, thank you very much, Ms. Hines. And Ms. Pathak, you have reserved three minutes. Thank you, Your Honor. So the promised benefit under the plan is a single life annuity and the value of that single life annuity, there is an accurate value to that single life annuity. How long will Mr. Odom live? How long is Mr. Odom going to live? I'm sure he'd like to know. I take your point, Your Honor. But when I, so the term actuarial equivalence, right, requires us to look at the judgment of actuaries. Actuaries, it's a well accepted concept that an annuity has a present value. And that's not an arbitrary number. But I mean, I get that. But isn't that only over a class of people, right? So no individual, you don't know how long an individual is going to live. You can't say how long, how much an individual's annuity is worth. But you can say in like the aggregate. And I guess isn't the question here, well, what are the assumptions you're going to apply when someone sits down to retire and says my options are a single life or a joint life? And figuring out when the plan says, OK, you get $1,000 over here and you get $900 a month over here, right? Isn't, I mean, that's the question. It's for the individual. Certainly the calculation happens on an individual level, Your Honor. But that doesn't mean that Mr. Odom's single life annuity doesn't have a present value. We know that it has a present value. We know that the way the plan figures out what the present value of that is when they're figuring out how much money they need to set aside is by looking at realistic current mortality assumptions. I mean, I guess, but the real present value, though, wouldn't look at just mortality like from whatever the most updated mortality tables. You would have to take into account someone's high blood pressure, someone's preexisting conditions, their family history. Like if you really wanted to get to the objective value of a single life annuity, you'd have to do sort of an individualized assessment of the individual to determine how long they're going to live. And that would change everything, right? Well, the way an actuary is going to calculate the present value is not by doing that kind of individualized assessment. In a context like this, they're going to look at the population, which is why the Treasury Regulation actually authorizes that. And so, by the way, Your Honor, this is not a reason to reject our interpretation of the statute or a reason to adopt a standard list approach to 1055-D. I think your point is well taken that there needs to be some consideration of what an actuary is going to do to value the single life annuity. But when you look at how the statute tells plans to value the single life annuity, and also the joint annuity, by the way, when they're figuring out what the expected outlay is going to be for a joint annuity, the monthly amount may be affected, calculated by using old assumptions. But when they actually figure out how long they're going to have to pay that, they look at current mortality tables. And so the fact that we know that there's a present value to the single life annuity, we know that they have to match it. They are not doing that, the real one. Is your argument that in this context to match the plans that the plan is obligated to use the same set of actuarial assumptions to value the single life annuity in this context as it does in the context of understanding how much money it needs to be prepared to set aside? No, Your Honor. So I think it's clear from the statutory context that had Congress wanted to set to very specifically prescribe the assumptions, it would have used the same structure. But isn't that effectively what you're arguing? I mean, you're right. I didn't see that specific argument. But if they're obligated to use reasonable assumptions over here and you're saying, well, you have to use reasonable assumptions over here, too, in order to be accurate. Why isn't that effectively what you're saying? Tell me what I'm missing. There's going to be a range of reasonable assumptions, Your Honor. So they don't—Congress knows how to be very specific when it wants to be. But here, what it's doing, it's requiring a certain result. And if you want to get to the proper result, you have to get there the right way. Now, a broken clock can be right twice a day. But the point is that you have to use the assumptions that are going to get you to the right answer. And those are reasonable assumptions. They're required to use one of some set of reasonable assumptions. And over here, they're also required to take some set—to take their choice from some set of reasonable actuarial assumptions, even if those two are not the same, as long as they're both in the category of reasonable actuarial assumptions. That's correct. I think that if a plan chose to adopt a variable standard for calculating joint annuities, one of the variable standards it already uses, like 417E, that would be considered reasonable. But that's not the only choice. There's different ways for the plans to comply. I see my time— No, I have one more question for you, which is just—I just— I'm sure you've got a view of this. How do you see this case proceeding? So the way I sort of was thinking it would proceed if you win is you would go back down and ultimately there would be sort of summary judgment papers where you have an actuary that says what they're doing is not reasonable and they find an actuary that says this is perfectly fine and reasonable and then a district judge decides which actuary is correct. Is that the way it would go? Our jury, I guess, eventually decides which actuary is correct? I think that's right, Your Honor. I think that as with any, you know, case that's informed by where the standard of liability is set forth with a standard like reasonableness, it's possible that there could be a motion for summary judgment, you know, may or may not prevail, move to a jury or a fact finder to determine whether or not the plan is in fact giving annuities that have the same present value as the single life annuities. Is there any sort of, I guess, like safe harbor in here somewhere where a plan would know that, look, I mean, the mortality tables, I mean, I think you've picked a good case, but interest rate is what seems crazy to me, right? If you can sue over mortality tables, then you could also sue over the interest rate that they use, which, I mean, goodness gracious, I mean, who knows what the right interest rate would be to use, right? And anybody could come up with a reason to use one interest rate over another. I guess I'm just trying to figure out, like, where is all this going as far as an ultimate determination by a fact finder about whether a plan is using the right figures or the wrong figures. I'm sympathetic to that, Your Honor, but of course reasonableness is a pretty familiar standard. It's also familiar in ERISA, the Supreme Court in Cornell versus Cunningham, right, was reasonably very comfortable with the idea of reasonableness as a standard. And so there are going to have to be experts that get involved, but the assumptions are going to have to be sort of reasonable in the aggregate. We want the present value to be equal. There may be difficult great cases, but on the other hand, a plaintiff is going to have to invest considerably in order to bring this kind of a case. And so they're not going to be incentivized to, I don't think, bring closed cases, right? We're going to have cases where we have a real disconnect, a problem. Plans need to be using somewhat realistic assumptions. I mean, as long as we're talking about litigation strategy, it's certainly true that, you know, settlement values or attorney's fees can often be a good incentive for cases to be brought, right? So, I mean, I think, Your Honor, we bring cases that we think have merit. And so I'm not sure we- I'm not saying you, I'm just saying in the aggregate. It's not clear that only, only, the only incentive to bring a case would be if there's a really serious problem, right? Again, not, I'm not, I'm not saying, I'm not saying you guys, but I'm just saying in the, in the aggregate for concerns about floodgates of litigation, there certainly are reasons that some parties bring cases besides a clear belief that something has gone wrong. Your Honor, theoretically, litigation can be brought for all kinds of reasons. I will say that here, you have to have an expert to even figure out that the joint annuity is worth less than the single life annuity. It's really difficult to figure this stuff out, right? It's complicated, as you all know. And so, you don't have cases that are being brought lightly here. And you have mortality assumptions that are being used from the 50s, Your Honor. Plans aren't, don't feel compelled to update their assumptions. It's important that we hold them to the standard that 1055D establishes. And I think that's a weighty concern that the court should, that the court should consider. I don't think that here you're going to have people bringing lawsuits when you've got like a dollar of it, a dollar worth of a difference. Thank you, Your Honor. Thank you, counsel. Well argued on both sides and we appreciate it. All right, the next case is Smothers v. Walker County.